UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Kenneth L. Mantell | ) | CASE NO. 5:11CV1034 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| vs. | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| | ) | |
| Health Professionals Ltd., et al., | ) | [Resolving Docs. 165, 166, 181] |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter comes before the Court on a motion for summary judgment filed by the Portage County Defendants[1] (Doc. 165) and a motion for summary judgment filed by the Medical Defendants[2] (Doc. 166).  Also pending before the Court is a motion to strike the affidavit and expert report of Lindsay Hayes supplied by Plaintiff Kenneth Mantell (Doc. 181).  The motion to strike is GRANTED.  The motions for summary judgment are GRANTED.

## I.  FACTS

Decedent Kenneth R. Mantell was engaged in a heated argument with the mother of his child, Lindsay Hamilton, at roughly 5:00 p.m. on May 20, 2010.  During the argument, Mantell called his mother and requested that she call the local police.  Streetsboro Officer Jon Hurley arrived on the scene a short time later and arrested Mantell for domestic violence.  At the time of the arrest, Hamilton informed Officer Hurley that Mantell needed to be on suicide watch.  Hamilton explained to Hurley that she was aware of a past suicide attempt by Mantell.

---

[1] The Portage County Defendants are Portage County, Ohio, Officer Kreider, and Officer Dan Cardinal.
[2] The Medical Defendants are Health Professionals, Ltd., Correctional Health Care Companies, Inc., Tammy Dalesandro and Rochelle Balk.

Shortly thereafter, Hurley transported Mantell to the Portage County Jail.  Officer Nathan Kreider was working the booking area at the jail at the time Mantell arrived.  After some initial questions by Kreider, Mantell was sent for medical pre-screening and screening to be performed by Licensed Practical Nurse Tamara Delasandro.  This pre-screening included Delasandro asking Mantell whether he had any thoughts of hurting himself or anyone else.  Mantell responded that he had no such thoughts.  Delasandro also indicated that there was nothing in Mantell's demeanor or appearance that suggested he had suicidal ideations.

During this pre-screening, however, Delasandro had not been given the information that Hamilton had provided to arresting officer Hurley.  While Officer Hurley provided this information to Officer Kreider in booking, the information was never passed along to any medical personnel.  Officer Kreider indicated that he intended to immediately pass along the information but was called away on another matter.  Officer Kreider had no explanation for his failure to pass along the information at a later time.

Following the pre-screening, Officer Kreider completed the booking process for Mantell and then returned him to Delasandro for the full medical screening.  During that process, Mantell was asked about any prior mental health treatment or issues.  Mantell responded that he had been seen for depression, but had never been prescribed medication for it.  Delasandro then asked whether Mantell had ever attempted suicide or had prior thoughts of suicide.  Mantell informed her that he had deliberately overdosed on Motrin in 2006.  Mantell indicated that the timing of this attempt corresponded with his depression and that he had used the attempt to try to gain attention from his mother.  Dalesandro made clear in her report and testimony that Mantell was calm, talkative, and even joked during the assessment and that he expressed no current signs that he had suicidal thoughts.  As a result, Mantell was not placed on behavioral or suicide watch.

2

Mantell was then arraigned by video at 1:00 p.m. on May 21, 2013.  According to Hamilton, Mantell remained calm throughout that proceeding until the judge indicated that he was going to put a restraining order in place.  According to Hamilton, Mantell then became visibly upset.  Following that proceeding, Mantell apparently made numerous calls to his family and a close family friend.  The content of those calls was unknown to any jail official.

At 3:00 p.m. on May 21, Officer William Tench reported for his shift at the jail.  Upon approaching Mantell's cell, Officer Tench noted that the lights and windows had been covered.  Upon learning that he was not allowed to cover the lights and windows, Mantell removed the coverings.  At 3:30 p.m., Officer Tench opened all of the cells in the area in which Mantell was housed.  Officer Tench observed Mantell using the phone in the common area, and a short time later, Mantell approached him to ask about purchasing a phone card.  Upon completing other tasks, Officer Tench summoned Mantell to a desk area to inform him that he would receive a written warning for having covered the lights and window in his cell.  Mantell responded, "Okay" and walked away.  Roughly seven to ten minutes later, Officer Tench heard an inmate yell, "This dude's hanging."

Officer Tench immediately issued an emergency code and ran to Mantell's cell at roughly 4:23 p.m.  At that time, Officer Tench observed Mantell hanging from his bed post, having fashioned a sheet into a noose.  Officer Tench and another inmate then attempted to lift Mantell and free him from the noose.  Another officer arrived roughly thirty seconds after Officer Tench and also attempted to assist.  Officer Kreider also arrived shortly after and Officer McCoy arrived at 4:24 p.m.  Upon his arrival, Officer McCoy called for medical personnel to come to Mantell's cell.  Mantell was then laid on the ground, and Office McCoy confirmed that he had no pulse and was not breathing.  As a result, Officer McCoy made a second call to medical to bring

3

the AED and oxygen.  None of the responding officers could state with certainty the precise amount of time it took for medical personnel to arrive in the cell.  Officer Kreider believed they appeared within one to two minutes of receiving the call from Officer McCoy.  Officer Tench believed that two nurses arrived roughly one minute apart at 4:30, or seven minutes after the initial yelling alerted Officer Tench to the situation.

Despite efforts, Mantell remained unconscious and unresponsive from the time Officer Tench reached his cell to the time he was transported out of the jail.  Mantell arrived at the hospital and remained on life support until July 5, 2010, when he was pronounced dead as a result of the injuries caused by his suicide attempt.

On May 20, 2011, Kenneth R. Mantell, Kenneth L. Mantell's father, filed this action on behalf of the estate.  In the first count of the complaint, Mantell raises a § 1983 claim, asserting this his son's Fourteenth Amendment rights were violated based upon the deliberate indifference of defendants to his serious medical needs.  Mantell's second claim is titled as "willful, wanton and reckless conduct" and simply claims that defendants acted in that manner.  Count three alleges a *Monell* claim against Portage County for failure to promulgate proper policies and train their personnel properly.  Count five[3] is a negligence claim against the Medical Defendants. Counts six and seven are a wrongful death claim and a survivorship claim.

On December 3, 2012, the Portage County Defendants moved for summary judgment. On that same day, the Medical Defendants filed their motion for summary judgment.  On January 2, 2013, Mantell opposed the motion filed by the Portage County Defendants, and on January 4, 2013, he opposed the other motion for summary judgment. On January 21, 2013, all the defendants replied in support of their respective motions, and the defendants jointly moved to

---

[3] There is no count four in the complaint.

strike the expert report and affidavit of Lindsay Hayes.  On January 30, 2013, Mantell opposed the motion to strike, and defendants replied in support of that motion on February 6, 2013.  The Court now resolves the pending motions.

## II.  <u>MOTION TO STRIKE</u>

Defendants' motion to strike was premised upon a conference the Court had with the parties on December 12, 2012.  The status conference was preceded by a case management conference that was held on September 8, 2011.  During that initial conference, the Court declined to set a date for expert discovery, instead ordering the parties to complete the depositions of Officer Hurley, Lindsay Hamilton, Plaintiff, decedent's mother, Nurse Delasandro, Nurse Balk, and at least one other named defendant.  The Court then set an initial status conference for December 12, 2011.  Upon defense motion, that status was continued to January 5, 2012.  Following that conference, the Court allowed further discovery to occur, including compelling the production of notes maintained by Rose Mantell.  The Court then conducted a telephone conference on March 19, 2012.  Based on that conference, the Court ordered as follows on March 21, 2012.

> Fact discovery in this matter will close on **June 30, 2012**. Plaintiff shall identify and provide reports from his experts no later than **June 1, 2012**. Defendants shall identify and provide reports from their experts no later than **September 4, 2012**. All expert discovery shall be completed by **October 15, 2012**. … Absent extraordinary circumstances, the dates herein will not be extended.

Doc. 114 at 1 (emphasis in original).  Throughout these proceedings, Local Rule 26.1 has served to inform the parties, as the Court orally did, that "[a]bsent leave of court, the parties have **no authority** to modify the limitations placed on discovery by court order."  (emphasis added).

Into August of 2012, the parties continued to file their 45-day status reports as required by the Court's initial case management plan.  On August, 8, 2012, Plaintiff indicated that he was

"not aware of any developments that would require a deviation from the current case management plan." Doc. 138 at 2. Within the week prior to that status report, both the Medical Defendants and the Portage County Defendants also indicated that they knew of no reason to deviate from the Court's prior schedule.

On October 1, 2012, the Medical Defendants were the first to inform the Court, via status report, of a possible scheduling issue, noting "Due to schedule conflicts, it appears the first date on which all parties are available for the deposition of Plaintiff's expert, Lindsay M. Hayes of Massachusetts, is December 11th, although that date has not yet been confirmed." Doc. 139 at 1. The Medical Defendants believed at that time that a 90-day extension may be necessary, but never sought such an extension. The following day, the Portage County Defendants filed their status report, noting that three expert depositions had been scheduled in December of 2012 and therefore an extension of the Court's expert deadline may be necessary. On October 5, 2012, Plaintiff filed his status report, stating "As stated above, due to scheduling issues with defense counsel, the expert depositions **will occur** beyond the October 15, 2012 deadline set by this court." Doc. 141 at 2 (emphasis added).

Despite never seeking leave of this Court to extend that deadline, three notices of depositions were filed, indicated depositions as far out as December 18, 2012. The Court's October 15, 2012 deadline passed without a motion to extend being filed by any party to the litigation. In fact, no such extension was sought until November 28, 2012, more than 30 days beyond the *expiration* of the Court's deadline. Furthermore, it is apparent that the motion to extend expert discovery was only filed because this Court denied a motion to extend the dispositive motion deadline and noted "No formal motion to extend the expert discovery deadline has ever been made in this matter." Doc. 151. In other words, it is readily apparent that

the parties would **never** have sought an extension had the Court denied another motion that was premised upon that extension's existence.  This tardy filing occurred despite the Court's prior admonitions that deadlines could not be extended simply by agreement of the parties and the Court's repeated admonitions that last-minute attempts to extend any deadline would not be looked upon favorably.

With this out-of-time motion pending, the Court conducted the status conference on December 12, 2012.  In denying the motion, the Court stated as follows:

> There will be no further expert testimony in this case, nor any further discovery for the reasons I'll set forth now:
>
> I issued an order on March 21 and indicated that discovery in this matter will close on June 30, 2012. The plaintiff shall identify and provide reports from his experts no later than June 1, 2012. Defendants shall identify and provide reports from their experts no later than September 4, 2012. All expert discovery shall be completed by October 15, 2012. And dispositive motions shall be filed no later than December 3, 2012. The final line of my order was, absent extraordinary circumstances, the dates herein will not be extended.
>
> …
>
> It is pretty obvious to me from reviewing the record the parties have simply chosen among themselves to disregard my order regarding experts. Your status report seems to indicate you can simply, in your own mind, disregard the court's order and set dates outside of the dates I've put in place.
>
> By way of example, the plaintiff's recent filing on October 5, the status report simply concludes by saying as stated above, "Due to the scheduling issues with defense counsel, the expert depositions will occur beyond the October 15, 2012 deadline set by the court."
>
> There's no mention made of seeking leave, no mention of any motion, no mention whatsoever of any extraordinary circumstances. Simply saying, "We will do as we wish to do in this particular matter," and that has been somewhat of a pattern, and it has in my view been somewhat -- not somewhat, just willful conduct. "We will do what we want to do. We will conduct discovery as we wish, and we will set dates as we wish."
>
> In fact, the earliest dates that were scheduled for deposition in this case, according to notices filed in the record, were sent in December, after a -- apparently by

7

agreement of counsel, after the deadline that I put in place and no extension had been sought.

…

There will be no expert reports or no expert deposition.

If there's any experts providing affidavits, they may be subject to being stricken because there has been no depositions taken. I've seen no expert affidavit submitted in support of the defendants' motions for summary judgment.

So if you intend on filing something that has not been subject to deposition, as I ordered, then I'll address that in due course.

…

I expect no gamesmanship on these motions with regard to discovery or disclosures or affidavits from people that haven't been deposed or individuals that haven't been subject to the usual discovery that I've required in this case.

There's been a lot of disregard of the court's orders here, and I will not tolerate it.

And I will tell you now, if I see anything else along the lines of what I've seen here in this case, there will be sanctions, including up to and including dismissal of the plaintiff's case or defendants' defenses in the matter.

Despite these admonitions, Mantell filed an affidavit and expert opinion from an expert witness that was not deposed during discovery.

In opposition to the motion to strike, Mantell claims that exclusion would unfairly punish him for the defendants' failure to timely depose his expert.  In so arguing, Mantell wholly ignores that there were five experts in this matter, none of whom were deposed by the deadline imposed by this Court.  As a result, both Mantell and all of the defendants have been deprived of the ability to use their experts.  Furthermore, were the Court to adopt Mantell's argument, all of the defendants could likewise utilize their experts because it was Mantell that failed to timely depose those experts.  Such reasoning would lead to the Court having no enforceable deadline or sanction.  The Court will not indulge in such reasoning.  The parties were equally to blame for

8

their complete failure to abide by the Court's schedule for completing expert discovery. Similarly, they are equally punished by each being deprived of the ability to rely on their experts.

Furthermore, as detailed above, the parties were advised as early as July 25, 2011 that they could not extend the Court's deadlines by their own private agreement.  They were further advised that last-minute requests to extend deadlines would not be looked upon favorably. Herein, it was not even a last-minute motion that was filed.  Instead, the first time an extension of the expert discovery deadline was sought was more 40 days after the deadline had passed.[4] Moreover, even then, it was the Medical Defendants that sought the extension – not Mantell. As all of the parties chose to 1) ignore the Court's deadline, 2)sought to extend deadlines on their own after learning that was improper, and 3) never timely sought an extension, the motion to strike is GRANTED.

## III.  LEGAL STANDARD FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56(a), the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The party moving for summary judgment may satisfy its burden under Rule 56 in either of two ways: (1) "submit affirmative evidence that negates an essential element of the nonmoving party's claim," or (2) "demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986).

A movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on

---

[4] For that matter, the first time any party informed the Court of a possible need for an extension was October 1, 2012, only 14 days before the final deadline.

9

file. *Id.* Likewise, the moving party's burden of production "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n.*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), *citing Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. Columbus*, 801 F.Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.*

10

## II.  ANALYSIS

### A. Claims Against the Portage County Defendants

1.  Deliberate Indifference

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by

the Constitution and laws of the United States, and must show that the alleged deprivation was

committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

> The right to adequate medical care is guaranteed to convicted federal prisoners by
> the Cruel and Unusual Punishment Clause of the Eighth Amendment, and is made
> applicable to convicted state prisoners and to pretrial detainees (both federal and
> state) by the Due Process Clause of the Fourteenth Amendment. *See Estelle v.
> Gamble*, 429 U.S. 97, 101-02, 104-05 (1976); *DeShaney v. Winnebago County
> Dep't of Soc. Servs.*, 489 U.S. 189, 198 (1989); *Weaver v. Shadoan*, 340 F.3d 398,
> 410 (6th Cir. 2003); *see also Bell v. Wolfish*, 441 U.S. 520, 545 (1979)
> ("*Afortiori*, pretrial detainees, who have not been convicted of any crimes, retain
> at least those constitutional rights that we have held are enjoyed by convicted
> prisoners."). A prisoner's right to adequate medical care "is violated when prison
> doctors or officials are deliberately indifferent to the prisoner's serious medical
> needs." *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001), cert. denied,
> 537 U.S. 817 (2002). Although the right to adequate medical care does not
> encompass the right to be diagnosed correctly, this court has "long held that
> prison officials who have been alerted to a prisoner's serious medical needs are
> under an obligation to offer medical care to such a prisoner." *Id.* (citing *Danese v.
> Asman*, 875 F.2d 1239, 1244 (6th Cir. 1989), cert. denied, 494 U.S. 1027 (1990)).

*Johnson v. Karnes,* 398 F.3d 868, 873-874 (6th Cir. 2005).  Furthermore, the Sixth Circuit has

previously described the standard for deliberate indifference as follows.

> [U]nder the Eighth Amendment's proscription on cruel and unusual punishment,
> prisoners have a constitutional right to medical care. *Estelle v. Gamble*, 429 U.S.
> 97, 103 (1976). The Court explained that a prisoner's Eighth Amendment right is
> violated when prison doctors or officials are deliberately indifferent to the
> prisoner's serious medical needs. *Id*. at 104. While the right to medical care for
> serious medical needs does not encompass the right "to be screened correctly for
> suicidal tendencies," we have long held that prison officials who have been
> alerted to a prisoner's serious medical needs are under an obligation to offer
> medical care to such a prisoner. *Danese v. Asman*, 875 F.2d 1239, 1244 (6th Cir.
> 1989), *cert. denied*, 494 U.S. 1027 (1990), (noting that "[i]f a prisoner asks for
> and needs medical care, it must be supplied"); *see also Yellow Horse v.
> Pennington Cty*., 225 F.3d 923, 927 (8th Cir. 2000) (holding that prisoner "had a
> clearly established constitutional right to be protected from the known risks of
> suicide and to have his serious medical needs attended to"); *Waldrop v. Evans*,

11

> 871 F.2d 1030, 1033 (11th Cir. 1989) (noting that prison inmate has Eighth Amendment right be free from deliberate indifference to serious psychiatric needs).
>
> An Eighth Amendment claim has two components, one objective and one subjective. To satisfy the objective component, the plaintiff must allege that the medical need at issue is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the subjective component, the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk. *Farmer*, 511 U.S. at 837. Emphasizing the subjective nature of this inquiry, the Supreme Court has noted that "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id*. at 838 (emphasis added).

*Comstock v. McCrary*, 273 F.3d 693, 702-703 (6th Cir. 2001).

With respect to the Portage County Defendants, Mantell's § 1983 claim focuses on an alleged constitutional right to be protected from self-harm.

> Thus, in the specific context of detainee suicide-the event at issue in this case-this Court inquires "whether the decedent showed a strong likelihood that he would attempt to take his own life in such a manner that failure [by a defendant] to take adequate precautions amounted to deliberate indifference to the decedent's serious medical needs." *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005) (quoting *Barber v. City of Salem*, 953 F.2d 232, 239-40 (6th Cir. 1992)); *see also Novack*, 226 F.3d at 529 ("[A] prison official must be cognizant of the significant likelihood that [the detainee] may imminently seek to take his own life and must fail to take reasonable steps to prevent the [detainee] from performing this act.").

*Linden v. Washtenaw County*, 167 Fed.Appx. 410, 416 (6th Cir. 2006).

## a. The Objective Test

"The Sixth Circuit has long recognized that psychological needs manifesting themselves in suicidal tendencies are serious medical needs in the Eighth Amendment context." *Id*. (citations and quotations omitted).  With regard to the objective component, Mantell relies heavily upon the statement that Hamilton made to Officer Hurley at the time of the arrest.  In addition, Mantell relies upon the fact that the decedent had treated for depression in 2005 and had overdosed on pills in 2006.

12

Initially, the Court's review of the totality of the facts leads to the conclusion that Mantell has fallen well short of demonstrating the objective component of his claim.  The record herein demonstrates that the decedent openly discussed his prior depression treatment and prior suicide attempt with Delasandro during his pre-screening and screening.  These events occurred roughly four years prior to the instant arrest.  Moreover, Delasandro made clear that her observations and direct interaction with the decedent did not raise *any* indication that he may remain depressed or harbor thoughts of self-harm.

The Court, however, must also examine Mantell's claim that Officer Kreider's failure to relay Hamilton's statement to the nursing staff is somehow indicative of deliberate indifference.  In raising that argument, Mantell claims that Delasandro admitted that if she had received that information, she would have placed the decedent, at a minimum, on behavior watch.  However, in so doing, Mantell distorts the record.  During her deposition, Hamilton noted:  "I just flat out told him [Officer Hurley], I told him, I'm, like, He needs to be on suicide watch."  Doc. 155-1 at 57.  When asked if she explained this statement any further, Hamilton responded:  "He asked me why I thought that and I told him he's had prior – prior happenings with it, prior discussions about it. I knew that he was suicidal."  *Id.*  In her deposition, Delasandro specifically noted that knowledge of this one prior suicide attempt would not have altered her conclusion about suicide watch.  She was asked:  "If, hypothetically, that had been relayed to you, that his longtime girlfriend had relayed concerns about Kenneth and told the officer to keep an eye on him – make sure an eye was kept on Kenneth, would you have put him on suicide watch?"  Delasandro responded:  "If she said to the officer to keep an eye on him because he had had the one attempt, no.  That wouldn't have made any difference to me with the one attempt that we knew of.  That wouldn't have made a difference."  Doc. 158-1 at 69.  It was only when the hypothetical was

altered that Delasandro drew a different conclusion. In the new hypothetical, Delasandro was asked to assume that Hamilton told Officer Hurley, "You need to keep an eye on him. I know him. He will hurt himself." Under that scenario, Delasandro agreed that she would have placed the decedent under some form of behavior watch. However, as the quoted language above demonstrates, Hamilton informed Officer Hurley to keep an eye on the decedent because she knew of his prior suicide attempt. Thus, the latter hypothetical has no factual basis to support it. Lacking that factual basis, it cannot be utilized to demonstrate the objective component of Mantell's deliberate indifference claim.

**b. The Subjective Test**

To satisfy the subjective component, a plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk. *Linden* 167 Fed.Appx. at 416 (citing *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970). "Emphasizing the subjective nature of this inquiry, the Supreme Court has noted that an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id*. (citing *Farmer* at 838 (quotation omitted)).

There is no evidence in the record that any Portage County employee subjectively perceived facts from which they inferred that the decedent was at substantial risk. Instead, the evidence strongly indicates that each interaction that the officers had with the decedent pushed them further from any such conclusion. Even having received the above information from Officer Hurley, the record does not support that Officer Kreider subjectively perceived any risk. Furthermore, the non-binding precedent relied upon by Mantell is readily distinguishable. For

example, in *Coleman v. Parkman*, 349 F.3d 534, 539 (8th Cir. 2003), "[d]uring the pre-arrest investigation, interviewees told Leary that Coleman was a suicide risk, had recently threatened suicide, and would kill himself if jailed."  As much as Mantell appears to argue that Hamilton relayed similar information, the record does not support this comparison.  Hamilton relayed only that she subjectively felt that the decedent was at risk because of his prior suicide attempt.  The factual landscape of this matter and *Coleman* are simply not comparable.

Furthermore, beyond receiving that statement from Officer Hurley, Officer Kreider directly interacted with the decedent throughout the booking process and thereafter.  During that time, the two discussed music concerts, and the decedent inquired about the bond process. Thereafter, Officer Kreider explained that process and led Mantell to his cell. At no time during those interactions did decedent engage in any action that Mantell has even argued would support an inference that he had suicidal ideations.

Similarly, while Officer Cardinal may have overheard Officer Hurley relay the information to Officer Kreider, Officer Cardinal had no other interactions with the decedent from which he could have subjectively perceived that he was at a substantial risk to commit suicide. These facts stand in stark contrast to the facts this Court confronted in *Galloway v. Swanson*, Case No. 5:09CV2834.  In that matter, the detainee became agitated during screening when the topic of suicide was raised, showed clear signs of delusions during that screening, and was in fact placed on suicide watch because of the odd behaviors he was exhibiting.  The decedent herein, however, engaged in no unusual behavior, remained highly cooperative throughout his arrest and processing, and never showed any objective sign that he was contemplating suicide.

Accordingly, Mantell's deliberate indifference claim against the Portage County Defendants fails as a matter of law.

2.  Willful, Wanton, and Reckless Conduct

In the second count of his complaint, Mantell alleges willful, wanton, and reckless conduct by all the defendants.  The Portage County Defendants properly highlight that there exists no such cause of action under Ohio law.  Accordingly, this claim cannot stand on its own.

3.  *Monell* Claim

Having found that Mantell failed to demonstrate a violation of his constitutional rights, it follows that his claim for insufficient policies and/or training, must fail as well.  "To impose § 1983 liability on a municipality or local governmental entity, plaintiff must show that an officially executed policy, or the toleration of a custom, resulted in a constitutional deprivation." *Molton v. City of Cleveland*, 839 F.2d 240, 243 (6th Cir. 1988).  "Suing a municipal officer in his official capacity for a constitutional violation pursuant to 42 U.S.C. § 1983 is the same as suing the municipality itself[.]"  *Kraemer v. Luttrell*, 189 Fed.Appx. 361, 366 (6th Cir. 2006). Therefore, the finding that a constitutional violation occurred is axiomatic to analyzing whether the policy at issue resulted in the constitutional violation. *Thurmond v. County of Wayne*, 447 Fed.Appx. 643, 651 (6th Cir. 2011). Thus, absent a finding of a violation of decedent's rights, there is no need for the Court to review whether the policy caused the alleged harm.  Here, as explained above, no constitutional violation occurred.

4.   Wrongful death and survivorship

The final claims in the complaint against the Portage County Defendants are wrongful death and survivorship claims brought under Ohio law.  In their motion, the Portage County Defendants claim that Ohio law is clear that suicide is an intervening force that breaks the chain

of causation and therefore undermines any claim for wrongful death.  Similarly, these Defendants assert that the fact that decedent never regained consciousness eliminates the ability to pursue a survivorship claim.  Mantell did not respond in opposition to either of these arguments.  The Court has reviewed the authorities cited by the Portage County Defendants and the facts herein and finds the arguments well taken.  Summary judgment is appropriate on these claims as well.

### B.  Claims Against the Medical Defendants

1.  <u>Deliberate Indifference</u>

In large part, Mantell argues this deliberate indifference claim by attacking the policies utilized by the Medical Defendants.  This argument fails for numerous reasons. First, the only support for his contention that the policies are insufficient is the expert report and affidavit that the Court has stricken.  Second, Mantell never pled a *Monell* claim against the Medical Defendants.  Instead, his theory has consistently been that medical personnel failed to properly screen and take precautions against the decedent's suicidal ideations.  As such, Mantell's focus on the Medical Defendants' policies and procedures is misplaced.

To that same extent, Mantell's argument that Nurse Delasandro admitted that she knew some information could be relevant but did not always glean that information is of little help in the Court's analysis.  In that regard, Delasandro conceded that certain charges could justify some form of behavior watch to protect the inmate.  These charges included murder, attempted murder, child abuse, and child rape.  Delasandro also conceded that *under the right circumstances*, domestic violence could lead to an inmate being placed on behavior watch. Based upon that testimony, Mantell appears to argue that Delasandro was deliberately indifferent when she did not seek out this information during screening.  However, Delasandro was adamant

17

that knowing this information would not have resulted in her placing the decedent on suicide watch – instead, she would have at most placed him on behavior watch and she was not certain that even that would have been necessary.

Mantell's reliance on *Probst v. Consolidated Cade, Inc.*, 2008 WL 320148 (S.D. Ohio Feb. 4, 2008) is also misplaced.  In that matter, the plaintiff "allege[d] that Defendants employed unconstitutional policies that constituted deliberate indifference to Christopher's medical needs under the Eighth Amendment.  Because of Defendants' reckless adherence to these unconstitutional policies and failure to assess Probst's mental state adequately, Christopher committed suicide."  *Id.* at *1.  As noted above, Mantell has never pled a claim about unconstitutional policies in this matter as it relates to the Medical Defendants.  As such, he cannot rely on *Probst.*  Moreover, unlike in *Probst*, the record herein does not establish that any entity was actively withholding information from Delasandro or any of the Medical Defendants. Instead, Mantell seeks to once again impose the standards his expert claims are appropriate on every decision made by the Medical Defendants in this matter.  As those standards have never been established as some floor to maintain constitutionally adequate care, they do not assist Mantell in pursuing his claim.

Much like the Court's analysis above, Mantell's deliberate indifference claim against the Medical Defendants falls well short.  There is simply **no evidence** in the record that the decedent ever exhibited signs of suicidal ideations prior to his suicide attempt.  All of the medical personnel and jail personnel that interacted with the decedent reported that he appeared normal with no unusual behavior of any kind, let alone behavior from which anyone could infer thoughts of suicide.  The deliberate indifference claim, therefore, fails as a matter of law.

    2.  <u>Counts Two, Three, Six and Seven</u>

As noted above, count two does not state a valid cause of action, but rather a mens rea that could alter damages on other clams. Accordingly, it fails as a matter of law. Count three is directed exclusively to the Portage County Defendants. Finally, Counts six and seven fail for the same reasons stated above in the Court's analysis of the Portage County Defendants' motion for summary judgment.

3.  Medical Negligence

In support of their motion for summary judgment on this claim of the complaint, the Medical Defendants assert that Mantell cannot prove this claim because he has failed to present any expert evidence to establish the standard of care. The Court agrees.

To prove his medical malpractice claim under Ohio law, Mantell was required to provide expert testimony regarding the recognized medical standards and whether his doctors breached those standards. *Rogoff v. King*, 91 Ohio App.3d 438, 445 (Ohio Ct.App.1993) "Failure to establish the recognized standards of the medical community has been fatal to the presentation of a prima facie case of malpractice by the plaintiff [.]" *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 131, (Ohio 1976); *Buerger v. Ohio Dept. of Rehab. & Corr.,* 64 Ohio App.3d 394, 398, (Ohio Ct.App.1989). A plaintiff's failure to produce expert evidence on the standard of care or medical records showing lack of care generally results in dismissal. *Buerger*, 64 Ohio App.3d at 398.

However, expert testimony is not necessary under Ohio's "common knowledge exception" to the general rule requiring expert opinion. *Id*. at 400–01. The common knowledge exception generally applies in matters of gross inattention to obvious situations. *Id*. at 399; *Jones v. Hawkes Hosp. of Mt. Carmel*, 175 Ohio St. 503, 506–07 (Ohio 1964). Mantell asserts that the exception applies herein. The Court finds fault in this argument for numerous reasons.

First, Mantell's argument herein is once again premised upon the expert report that the Court has excluded.  Mantell contends that he is not challenging the clinical judgment of the nurses, but rather intends to show that the Medical Defendants' policies were so inadequate that even a layperson could conclude that *any* assessment done under those policies would be negligent.  As the expert's report has been excluded, Mantell could not pursue the claim in this manner.[5]

More importantly, the Court disagrees with the assertion that this medical malpractice claim does not require expert testimony.  Mantell is claiming that his prescreening and screening fell below the standard of care necessary to ensure that a proper review of his risk of suicide was completed.  The standard of care for such a screening is well beyond that of a layperson. Accordingly, expert testimony was necessary.  As a result, summary judgment in favor of the Medical Defendants is proper on this claim.

## V.    **CONCLUSION**

The Court GRANTS both pending motions for summary judgment and the joint motion to strike.  All claims in the complaint have been resolved and judgment is hereby entered in favor of Defendants.

IT IS SO ORDERED.

DATE: September 27, 2013          */s/ John R. Adams*_____
                                 Judge John R. Adams
                                 UNITED STATES DISTRICT COURT

---

[5] The Court also questions whether an expert from *outside* the medical field could properly be relied upon to establish the sole standard of care that a jury would consider in a medical malpractice action.

20